583 So.2d 349 (1991)
Chinaer McDANIELS, Appellant,
v.
STATE of Florida, Appellee.
No. 90-1120.
District Court of Appeal of Florida, Fourth District.
June 26, 1991.
Rehearing Denied August 12, 1991.
Richard L. Jorandby, Public Defender, and Louis G. Carres, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Carol Cobourn Asbury, Asst. Atty. Gen., West Palm Beach, for appellee.
STONE, Judge.
We affirm the appellant-juvenile's conviction and sentence for attempted first degree murder.
Initially there was no abuse of discretion in the court's refusal to instruct the jury on the reputation of the victim for violence where there was no evidence that the appellant knew of that reputation. Cf. Hager v. State, 439 So.2d 996 (Fla. 4th DCA 1983); Nunez v. State, 542 So.2d 1061 (Fla. 3d DCA 1989). See also Banks v. State, 351 So.2d 1071 (Fla. 4th DCA), cert. denied, 354 So.2d 986 (Fla. 1977); Hodge v. State, 315 So.2d 507 (Fla. 1st DCA 1975).
The appellant also asserts that she was sentenced as an adult without full compliance by the court with the finding requirements *350 of section 39.111(7)(c), Florida Statutes, which provides:
(7) When a child has been transferred for criminal prosecution and the child has been found to have committed a violation of Florida law, the following procedure shall govern the disposition of the case:
(c) Suitability or nonsuitability for adult sanctions shall be determined by the court before any other determination of disposition. The suitability determination shall be made by reference to the following criteria:
1. The seriousness of the offense to the community and whether the protection of the community requires adult disposition.
2. Whether the offense was committed in an aggressive, violent, premeditated, or willful manner.
3. Whether the offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted.
4. The sophistication and maturity of the child, as determined by consideration of his home, environmental situation, emotional attitude, and pattern of living.
5. The record and previous history of the child, including:
a. Previous contacts with the department, the Department of Corrections, other law enforcement agencies, and courts,
b. Prior periods of probation or community control,
c. Prior adjudications that the child committed a violation of law, and
d. Prior commitments to institution.
In the course of an argument and some mutual pushing and shoving the appellant pulled a gun, stating, "I'm going [to] kill me a punk bitch." The victim turned and ran away. The appellant followed, shooting the victim in the back and arm. Prior to sentencing, the court considered a predisposition report. The court also heard brief testimony from the juvenile's mother and grandmother, apprising the court that the appellant was the mother of a young child and that she was a good girl.
The trial court made these written findings concerning appellant's suitability for adult sanctions:
1. This case involves a life felony, Attempted First Degree Murder in which a thirteen year old girl was shot in her back and arm.
2. The facts of this case are such that the Defendant in this case engaged in an argument with the victim over a boy and then the Defendant pulled out a handgun and chased the victim some thirty feet shooting at least five times. Two of the shots hit the victim. One shot hit the victim in her arm and the other in her back. The bullet lodged within half an inch of the victim's spinal cord.
3. Whether the offense was against persons or property, greater weight being given to offenses against persons, especially if personal injury resulted. This offense was against a thirteen year old, a minor, Monica Rush. Although no permanent injury occurred, she still has two scars from the bullet wound. The bullet is still lodged in her back, as it is too dangerous to try and remove it because it is too close to the spinal cord. She is not in any danger at this point, but will always carry the bullet and still has irritation and soreness in her back as a result of the bullet wound she received.
4. The sophistication and maturity of the Defendant. I did not find that there was any sophistication and maturity in this crime.
5. The record and previous history of Defendant. The Defendant has a prior incident involving a gun.
6. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the Defendant if she is assigned to juvenile services and facilities is very unlikely based on her violent and aggressive manner in using a handgun. Furthermore, this offense was committed on October 26, 1987, some four to five months after being placed on community control as a juvenile. Therefore, it is quite apparent that the juvenile services and facilities cannot adequately rehabilitate this young person, as she has shown she is a violent *351 and aggressive person with no regard for human life.
Appellant contends that these findings are not sufficiently detailed and specific to comply with the statutory mandate. See Flowers v. State, 546 So.2d 782 (Fla. 4th DCA 1989); Gooden v. State, 536 So.2d 392 (Fla. 4th DCA 1989); Leonard v. State, 522 So.2d 543 (Fla. 4th DCA 1988). In order to sustain the sentencing of a juvenile as an adult, the record must reflect that the trial court considered each of the statutory criteria, and must contain specific findings and reasons for the court's decision. § 39.111(7)(d). Here, in our judgment, the record reflects that the trial court has done so.
In Posey v. State, 501 So.2d 192 (Fla. 5th DCA 1987) the adult sentence of a juvenile was reversed because the order imposing sanctions did not in any manner address the criteria in section 39.111(7)(c)4 of the statute and in Flowers, this court reversed a juvenile's sentence because of the failure of the court to consider the statutory criteria prior to sentencing. In that opinion, we pointed out that the trial court, on remand, should comment on the juvenile's home, environmental situation, emotional attitude and pattern of living, considering the child's level of sophistication and maturity. Here, the trial court in considering criteria number 4 has not commented in writing on each of these aspects of appellant's life, choosing instead to state essentially that the child was immature and unsophisticated as reflected by her conduct. The court obviously determined that the other factors outweighed this lack of sophistication.
Here, although the court's written findings as to criteria number 4 were brief, we conclude that the record is sufficiently specific to reflect that the court considered all of the statutory criteria. We do not read Flowers to mandate that certain specific language be used as to each of the factors to be considered in determining the sophistication level of the appellant where the court has obviously determined that the child's lack of sophistication and maturity are outweighed by the other statutory factors, and the record reflects that the court is aware of and has considered the sophistication and maturity of the child in reaching its judgment.
Therefore, the judgment and sentence are affirmed.
WALDEN, JAMES H., Senior Judge, concurs.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
Believing that the trial court's decision would necessarily be the same if we were to send this back for further refinement, I concur with the majority's analysis and conclusion; however, the poverty and rage of youth prompt this additional discussion.
Many Americans are now reading about the inner city child in Alex Kotlowitz's There Are No Children Here: The Story of Two Boys Growing Up in the Other America (1991), currently on The New York Times best seller list. In his preface, the author describes how he came to write of two children:
In 1988, I suggested to their mother, LaJoe, the possibility of my writing a book about Lafeyette, Pharoah, and the other children of the neighborhood. She liked the idea, although she hesitated, and then said, "But you know, there are no children here. They've seen too much to be children."
One of every five children in the United States lives in poverty  an estimated twelve million children, according to the Children's Defense Fund. In cities like Chicago, the rate is considerably higher: one of every three children. Many grow up in neighborhoods similar to Lafeyette and Pharoah's. By the time they enter adolescence, they have contended with more terror than most of us confront in a lifetime. They have had to make choices that most experienced and educated adults would find difficult. They have lived with fear and witnessed death. Some of them have lashed out. They have joined gangs, sold drugs, and, in some cases, inflicted pain on others. But *352 they have also played baseball and gone on dates and shot marbles and kept diaries. For, despite all they have seen and done, they are  and we must constantly remind ourselves of this  still children.
LaJoe was not only agreeable to the project, she felt it important that their stories be told. She had once said to me that she occasionally wished she were deaf. The shooting. The screaming. Babies crying. Children shrieking. Sometimes she thought it would all drive her insane. So maybe it would be best if she couldn't hear at all. Her hope  and mine  was that a book about the children would make us all hear, that it would make us all stop and listen.
An ancient Oriental proverb suggests: It is better to light a candle than to curse the darkness.
Nevertheless, I suggest we must first address the darkness of poverty which is deepening to the same extent as our increasing lack of commitment to eliminating it. Neither William Julius Wilson's The Truly Disadvantaged: The Inner City, the Underclass and Public Policy (1987), nor Michael Harrington's The New American Poverty (1984) is part of our dialogue. The 1960's War on Poverty has long since been abandoned, notwithstanding the growing gap between our nation's "haves" and "have nots." One late lawyer often observed that the rich get richer and the poor have children. The May 26, 1991, issue of The New York Times quotes figures from page 1306 of this year's Green Book, compiled by aides on the House Ways and Means Committee as follows: "They show that from 1977 to 1988 the incomes of the bottom fifth of American families sank by 13 percent. By contrast, the top fifth of American families earned 27 percent more, while the top 1 percent saw their incomes nearly double." DeParle, The Nation: Richer Rich, Poorer Poor, and a Fatter Green Book, N.Y. Times, May 26, 1991, § 4, at 2.
Those who rationalize away our need to address poverty because of our stereotyped view that poverty is solely an inner city problem will be shocked to see the following conclusions from the "Child Poverty in America" report (1991):
Most poor children are white, live in small cities, suburbs or rural areas and come from working families, says a new report on child poverty by the Children's Defense Fund.
The report, "Child Poverty in America," says many Americans are unsympathetic to the plight of poor children because they see it as a problem of black, fatherless welfare families living in big cities.
"The stereotype is the exception," the report concludes.
Of the 12 million poor children, 4.2 million are black, but only 1.2 million of the black children are living on welfare in female-headed families in central cities, according to an analysis by Northeastern University's Center for Labor Market Studies.
The poverty rate in 1989 was 22.5 percent for children younger than 6 and 18.1 percent for children 6 through 17. That compares with a national poverty rate of 12.8 percent and a poverty rate among persons 65 and over of only 11.4 percent.
Poverty was defined by the federal government in 1989 as an annual income of less than $9,885 for a family of three and less than $12,675 for a family of four.
The report blames the rising poverty rate among children on the declining value of government aid to the poor; the failure of the minimum wage to keep up with inflation; changes in the job market that put parents out of work or lower their earnings, and increases in the proportion of children living in single-parent families.
The Stuart News, June 3, 1991, at A1.
On the same day, the following statistics from the above report were published: "From 1979 to 1989, the number of poor children had risen by 2.2 million to a net total of 12 million, about one-fifth the population and a higher percentage than in any other industrialized country." The Palm Beach Post, June 3, 1991, at 1A.
*353 How does poverty precipitate violence? On May 23, 1991, The Stuart News led off with an editorial, Children Killing Children, describing three fatal shootings of children by children within the previous four days in Florida communities, and adding:
Contributing factors? From today's catalog of social ills, take your pick: lack of supervision; broken families and pentup hostility; frustration due to poverty; a popular culture steeped in confrontation and violence. Those are just a few; anyone can think of more.
When this happens in Florida, close to home, it forcefully grabs our attention. But it's going on all across the country. According to FBI statistics, the annual number of people aged 10-19 who were shot to death took a 30 percent jump during the 1980s. Homicides by shooting, in that age group, totaled 1,336 in 1980; 1,770 in 1989.
Whatever other factors may be involved in a child-shooting, it seems the most common is easy access to handguns. They're everywhere, and the kids know where to find them.
Three days later, The New York Times reported the following story about an Oakland, California, boy:
A 12-year-old boy who imitated the swagger of the neighborhood drug dealers and boasted about his prowess with a gun is confined in Juvenile Hall here these days, tearful and frightened as he awaits a trial for murder.
... .
While the crime he is charged with is extraordinary, the 12-year-old is in many ways typical of the children of America's inner cities: raised by a single mother, searching for male role models and living in neighborhoods where drugs and guns are everywhere and economic and educational opportunities are scarce.
The N.Y. Times, May 26, 1991, § 1, at 11.
On the same day, The Miami Herald's lead story carried the banner headline: "Getting a Grip on Burgeoning Teen Violence." It reported:
More Dade teen-agers are shooting and stabbing each other than ever before in an unprecedented explosion of adolescent violence that has astonished judges, prosecutors, teachers, social workers  nearly everyone except the youngsters themselves.
In 1990, 119 teen-agers were arrested and charged with murder, attempted murder or manslaughter. That is more than twice the number arrested in 1989 and five times the number in 1984.
As the ages of the killers drop, the ages of the victims have dropped proportionately. In 1990, the youngest suspected killer was 12. The youngest victim was barely 1.
The Miami Herald, May 26, 1991, at 1A. It continued: "Many teen-age criminals suffered uprooted childhoods: They were beaten or sexually abused as children; they were raised through fear and intimidation; they lacked role models or authority figures; they became addicted to drugs; they believe the tools of a prosperous life are guns and bullets." Id. at 14A.
Simultaneously, The Miami Herald's lead article in the Viewpoint section, entitled Rethinking Juvenile Justice, was authored by Circuit Judge Thomas Petersen, who quoted the report of the Dade County Grand Jury, issued less than a month earlier, saying:
"While we recoil in horror at the often senseless brutality of crimes committed by teenagers, we appear unwilling to pay the price of attacking the problem. Business, education and human services seem unable to rally a combined effort to positively redirect a future generation presently embroiled in failure and rage," writes the Grand Jury in a passage indicative of the tone and theme of the report.
The Miami Herald, May 26, 1991, at 1C. He added:
Juvenile justice today, in any large city in America, is about race, poverty and alienation. And no judge and no "rehabilitation program"  if indeed there is such a thing  is going to solve that or wish it away.

*354 But we can begin to acknowledge it. We can begin to search the nation for programs that attempt to specifically address the needs of urban males. And programs and staff should be evaluated on the basis of how effectively they meet the needs of that group.
And we can try to address the one correlate  or cause  of delinquency that we inevitably find in any delinquent population: academic failure. Our inner-city kids in juvenile court literally cannot read the wording on the T-shirts they wear to court.
Id. at 6C.
The following day, The Palm Beach Post published an editorial entitled "Society Arms its Schools."
School officials are reminded each day that violence in society doesn't stop at the school gate. "The largest number of people that are together at any one time is in the schools," said Boca Raton High School Principal Norman Shearin, senior high chairman of the county principals association. Superintendent Tom Mills said eight handguns were confiscated on school grounds last year, 16 so far this year. The reports of weapons found on campuses  anything from guns to fivepointed knives  have increased from 180 last year to more than 200. "Clearly, we've got to get guns out of the hands of children," said Mr. Mills, "and I don't know how we're going to do that." But he's correct when he says that "ultimately we've got to get some kind of a total community-wide effort to deal with this problem."
The Palm Beach Post, May 27, 1991, at 14A.
The day after the Post editorial was published, the Florida Department of Law Enforcement's 1990 Annual Report, Crime in Florida, arrived in the mail, revealing that of the 171,312 violent offenses, 26,260 were committed by juveniles; that of the 1387 murder victims, 96 were juveniles; that of the 1381 arrests for murder, 206 were juveniles; and that of the 206,045 arrests for murder, forcible sex offenses, robbery, aggravated assault, burglary, larceny and motor vehicle theft, 50,663 were juveniles, 10,144 of who were female.
The rage of children  like their poverty  is not limited to the inner city child. On June 2, 1991, The Miami Herald ran the self-portrait by "Jimmy," which was part of a Dade County art exhibit, The Rage of Children, held earlier this year. Accompanying the self-portrait was an essay by Circuit Judge William E. Gladstone, which was prepared for the exhibit. He wrote:
"Jimmy" is your child and mine. We created him and his world. Jimmy is not his name, but his story is real. Jimmy, the young artist, was in a rage some weeks before he drew this picture.
There is nothing unusual about the rage of children. Children are born violent, but with adequate nurturing, education and role-modeling they move, as Professor Mark Moore of Harvard says, "from the status of helpless barbarians to resourceful citizens." Normally, the rage of children should pass as they become socialized, empathetic, mature adults. Too often that process does not occur, and children remain violent; they mirror the violence, the callousness of their parents and of the times and places in which they live.
... .
Huge numbers of children are addicted or victimized by the addict or by the diseased in mind or body. Of late, scores of thousands of children are born affected by parental cocaine use or infected by a parent's AIDS. One million teen-age girls become pregnant each year, and most of these child mothers are totally unable to parent their children. Commonly, America's children are either participating in or terrified by the violence in their streets and schools.
Our teen-agers hide their hopelessness and their lack of self or mutual respect behind their vulgarity, bass speakers, machismo and "wilding." They are left without the will to succeed or without the chance to succeed.
... .

*355 Jimmy lives in the suburbs. The only obvious abuse or neglect he suffered was that his mother did not love him. His rage was the quiet kind, but he was predictably "unattached" in this unattached society we have created. It strikes me as hypocritical, then, that the community expressed shock when Jimmy, 12, in his quiet rage and with careful planning but no harsh words, took out the family .357 magnum and shot his mother dead.
Gladstone, Do Not Blame Raging Children, Blame Yourselves, The Miami Herald, June 2, 1991, at 1J.
How do we light the candle? In their book, Within Our Reach: Breaking the Cycle of Disadvantage (1988); Lisbeth B. Schorr and Daniel Schorr state:
Three clear themes emerge: First, risk factors leading to later damage occur more frequently among children in families that are poor and still more frequently among families that are persistently poor and live in areas of concentrated poverty. Second, the plight of the children bearing these risks is not just individual and personal; it requires a societal response. Third, the knowledge to help is available; there is a reasonably good match between known risk factors and the interventions to reduce them.
The close association between poverty and risk holds for every component of risk  from premature birth to poor health and nutrition, from failure to develop warm, secure, trusting relationships early in life to child abuse, from family stress and chaos to failure to master school skills. Persistent and concentrated poverty virtually guarantee the presence of a vast collection of risk factors and their continuing destructive impact over time. (The converse is also true. Middle-class status is an effective buffer against a wide variety of risk factors.)
Id. at 29-30. They conclude:
We are now armed with the knowledge to meet that demand. We know how to organize health programs, family agencies, child care, and schools to strengthen families and to prevent casualties at the transition from childhood to adulthood. We know how to intervene to reduce the rotten outcomes of adolescence and to help break the cycle that reaches into succeeding generations. Unshackled from the myth that nothing works, we can mobilize the political will to reduce the number of children hurt by cruel beginnings. By improving the prospects of the least of us, we can assure a more productive, just, and civil nation for all of us.
Id. at 294.
Forty-six years ago, Lincoln Bogue, a caring judge, and Leonard Cooperman, a caring lawyer, produced a community response to poverty, neglect and an absence of role models by addressing prevention and early intervention through a Juvenile Welfare Board created by special act for Pinellas County. The legislature copied the special action as a general act, section 125.901, Florida Statutes (Supp. 1986). Five other counties now have Children's Services Councils  Palm Beach, Hillsborough, Martin, St. Lucie and Okeechobee  and are funding preventive and early intervention programs. Other counties  Brevard, Collier, Lee, Alachua, Pasco and Duval  have created the councils and, hopefully, will achieve similar permanent funding. All of these counties have chosen to light candles, rather than curse the darkness, combining risk taking, networking and political will. Borrowing Judge Petersen's words, these counties have employed "education, collaboration and community organization."
In November, 1990, the electors of Manatee County voted to give their county commissioners authority to levy an ad valorem tax not less than 1/20 of a mill and increasing to 1/3 of a mill by 1995 to fund prevention and intervention programs for children of low income families and for abused, neglected and at risk children.
In March, 1991, the Florida Study Commission on Child Welfare issued its report, including a sort of Bill of Rights for children in its recommendations, saying:
Florida must formulate policy for children and their families around these basic concepts:

*356 a. Every child must be:
1) protected from harm;
2) provided with basic food, clothes, and shelter;
3) provided with necessary medical services and a basic education; and
4) provided with the opportunity for cognitive, aesthetic and emotional development.
b. When help is needed, the first obligation is to assist the child in his or her family. If, despite such assistance, the family cannot meet the basic needs of its children, government must assure that their needs are met, regardless of economic status.
c. Local communities are best suited to identify needs, provide accountability, and support a child's sense of identity. Local communities should be given more control in selecting, purchasing, and delivering services to children and families in compliance with statewide standards.
The trial judge in this case, as well as the law enforcement officers involved in the defendant's arrest, are in the best position to appreciate that an ounce of prevention is worth a pound of cure  and a ton of punishment. They are also in the worst position in the societal scheme of things to deal with anything other than punishment in their official duties, being at the end of the line for the dependent child who is without access to prevention and early intervention programs and who progresses to delinquency and then to adult crime.
Nevertheless, trial judges  off the bench  and law enforcement officers  off duty  have been significant leaders in the creation of children's services councils and boards in county after county in Florida to fund prevention and early intervention programs.
Circuit Judge J. Leonard Fleet, in his recent CLE presentation, Do It Or Lose It, sponsored by The Florida Bar's new Public Interest Law Section, concludes by saying:
It makes good economic sense to cure social ills which, by and large, create criminal behavior. It costs a lot of money to house and care for persons who have been incarcerated. If we can reduce the jail population through crime prevention or through worthwhile alternatives to incarceration, then these same tax dollars and human resources can be employed to address the vast array of other social problems with which we are confronted on a daily basis, each of which make some substantial contribution to the incidence of crime.
Mr. Kotlowitz includes two brief poems in his above-quoted book:
What happens to a dream deferred?
Does it dry up
like a raisin in the sun?
Or fester like a sore 
And then run?
Does it stink like rotten meat?
Or crust and sugar over 
like a syrupy sweet?
Maybe it just sags
like a heavy load.
Or does it explode?
 Langston
Hughes Ah! What would the world be to us
If the children were no more?
We should dread the desert behind us
Worse than the dark before.
 Henry Wadsworth Longfellow